UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHAKI PORTERFIELD,

        Plaintiff,

v.

SHOE SHOW OF ROCKY MOUNT, INC.,
d/b/a SHOE SHOW, INC., BURLINGTON
SHOES, and THE SHOE DEPT.,

        Defendant.

_____/

Case No. 08-10731

HON. MARIANNE O. BATTANI

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.   INTRODUCTION**

Before the Court is Defendant The Shoe Show of Rocky Mount, Inc.'s ("Shoe Show") Motion for Summary Judgment. (Doc. 14). In her complaint, Plaintiff Ashaki Porterfield claims that Shoe Show discriminated against her on the basis of her race and sex, in violation of the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2201 *et seq.* ("ELCRA"). In addition, Porterfield contends that Shoe Show retaliated against her for filing civil rights claims and a worker's compensation claim, in violation of ELCRA and the Worker's Disability Compensation Act ("WDCA"). For the reasons discussed below, the Court grants Shoe Show's Motion for Summary Judgment.

II.    **STATEMENT OF FACTS**

On April 1, 2005, Plaintiff Ashaki Porterfield, an African-American woman, was hired by Shoe Show to work as a store manager. In November 2005, Mike Floyd, a "buyer" for Shoe Show, asked Porterfield what percentage of the store's customers were black. Porterfield told Floyd that the store's customers were about 50% black. The vice president of Shoe Show then asked Porterfield about the percentage of whites, blacks, and Hispanics. She said that the store's customers were about 50% white, 40% black, and 10% Hispanic.

On November 25, a vehicle struck Porterfield in the store's parking lot. She missed her next scheduled day of work because of her injuries, and returned to work on November 28. On March 10, 2006, however, she had surgery on her injuries and, as a result, she was unable to work from March 31, 2006 through September 21, 2006.

Porterfield returned to work on September 22, 2006, with physician-imposed restrictions. In particular, Porterfield had to have a sit/stand option and could not lift more than 10 pounds or reach above shoulder level. Upon returning to work, Porterfield worked as long as her body would let her, which she estimated to be about 20 hours a week. Testimony from Karen Cheek, who worked in Shoe Show's Human Resources department, indicated that Porterfield was staying at work for only 1 to 3 hours during each of her shifts. Prior to the accident, Porterfield stated that she had been working 48 hours a week. In a questionnaire Porterfield filled out in October 2006, she responded to a question asking whether she was able to do the major duties of her prior position with or without an accommodation by checking the "Yes" box and writing "but not all" next to the box.

On October 4, 2006, Cheeks states that she spoke to Porterfield about her apparent inability to work the 48-hour workweek that the store manager position required. In addition, Cheeks discussed how there were no part-time manager positions available. Cheeks stated that the point of the conversation was to notify Porterfield of her concern about the hours she was working as a store manager. Cheeks waited about a week to see if Porterfield increased her hours.

Porterfield did not increase her hours, and Cheeks spoke to J. Manning, the Director of Human Resources for Shoe Show, around October 10, 2005. Cheeks expressed her belief that Porterfield was unable to do the duties of a store manager at the time. Cheeks believed "the best opportunity we had for transitional duties on a temporary basis or however long her restrictions [lasted], would be as a part-time keyholder." Porterfield described a keyholder as an assistant manager. Cheeks stated that Mr. Manning accepted her recommendation, and Porterfield was offered this accommodation the next day. According to Floyd and Manning, Floyd had no role in this, or any other, decision affecting Porterfield's employment.

Cheeks explained to Porterfield the rate of pay for the keyholder position and how workers' compensation carrier would pick up either temporary partial or supplemental earnings benefits. As a store manager, Porterfield made $790/week, whereas she would make approximately $10/hour as a keyholder. On October 11, 2006, Porterfield obtained new physician-imposed restrictions that were similar to her previous restrictions, except that she also was prohibited from bending, stooping, or twisting. Cheeks indicates that on October 12, 2006, Porterfield initially accepted the

reassignment, but she later refused to sign the Compensation Agreement for the position.

On October 17, 2006, Floyd visited the store at which Porterfield worked. Porterfield indicated that, on that date, she entered a room where Floyd had his back to her while he was speaking to Howard Myers, the district manager. She overheard Floyd make a statement to Myers along the lines of, "that nigger got to go." Porterfield stated that Myers saw that she had heard what Floyd said and that when Myers walked past her a short time later, she tried to discuss Floyd's statement with him, but he "just brushed [her] off." She said that, "it was like he didn't want to hear it."

Floyd denied ever making such a statement. Likewise, Myers indicated that Floyd had not made such a statement and that he had not wanted to hear from Porterfield about it. Three other employees testified that they never heard Floyd or any other Shoe Show employee make any derogatory or discriminatory statements about, or to, Porterfield.

Tasha Douglas, however, was shopping at the Shoe Show store at the time, and she heard a man in the Shoe Show store state, "that nigger has to go." She thought the statement was directed at Porterfield. Douglas knew Porterfield because she had attended middle school and part of high school with her, and although she left the store without talking to Porterfield, she called Porterfield later to see if she had heard the statement.

When Porterfield clocked out of work that day she entered into the time-keeping computer "In pain. Also Mike Floyd made me feel uncomfortable." On October 19,

4

2006, Porterfield faxed a notarized note to Shoe Show indicating that she would not be reporting to work that day because of her work injuries.

On October 20, 2006, Myers told Porterfield that he wanted her to sign the Compensation Agreement and that if she did not sign it he would have to ask her to leave the store. Porterfield left the store. Porterfield testified that this was the first time she was presented with the Compensation Agreement and that Cheeks referred to the position change as a demotion.

On October 21, 2006, Porterfield again was asked to sign the Compensation Agreement. Cheeks testified that Porterfield wanted to think about it, and Myers asked her to go home to think about it. He told her that he would contact her later to find out what needed to be done.

Porterfield returned to work on October 23 and again declined to sign the Compensation Agreement. Cheeks told Porterfield to go home so that she could speak with Manning, who was not available at that time. Porterfield told Cheeks that she was not signing anything and that she was not leaving because she was scheduled to work. She then told Cheeks to "do what you got to do." Cheeks had mall security escort Porterfield out of the store.

Cheeks said that Porterfield's employment had not been terminated; instead, she merely was told to leave the store at that time. Porterfield testified that Cheeks said that because she would not sign the Compensation Agreement, they did not have any work for her, and she needed to leave. Porterfield has not talked to anyone from Shoe Show since she was escorted from the store by mall security. Porterfield testified that the security officer told her that she had been fired, but she did not recall anyone from Shoe

5

Show telling her that she had been fired.  It appears that Justin Beatty, who is Caucasian, replaced Porterfield as the store manager.

In June 2007, Cheeks completed a Separation Report relating to Porterfield and indicated that there had been an involuntary separation due to insubordination.  Cheeks testified that she felt that insubordination was the only option applicable in light of Porterfield's refusal to accept the keyholder position, so she checked that on the form, which was categorized as an involuntary separation.  Cheeks said that Porterfield had never been fired and that the form just needed to be filled out in order to remove Porterfield from the company pay system.

Porterfield filed charges of discrimination with the Michigan Department of Civil Rights on October 18 and October 26, 2006.  Manning testified that Shoe Show had no knowledge of Porterfield's allegations and charges before it received an October 26, 2006, letter from the Equal Employment Opportunity Commission regarding the charges.

### III.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  There is no genuine issue of material fact if there is not a factual dispute that could affect the legal outcome on the issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In other words, a dispute about a material fact is "'genuine' . . . if the evidence is such that a reasonable

6

jury could return a verdict for the nonmoving party." Id. In determining whether to grant summary judgment, this Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008).

**IV.   ANALYSIS**

*1.   Discrimination Claims*

Both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and ELCRA prohibit race-based discrimination in the workplace. 42 U.S.C. § 2000e-2(a)(1); M.C.L. § 37.2202(1)(a). The same principles apply to claims under both provisions. See Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999). Therefore, although Porterfield is not bringing any claims under Title VII, federal law addressing Title VII is relevant to her ELCRA claims.

One way in which a plaintiff may demonstrate racial discrimination is through direct evidence. "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (addressing discrimination under the ADEA); see Sniecinski v. Blue Cross and Blue Shield of Michigan, 469 Mich. 124, 132-33 (2003). When deciding if a comment is evidence of discrimination, the Court must consider "whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate

in time to the act of termination." Cooley v. Carmike Cinemas, 25 F.3d 1325, 1330 (6th Cir. 1994).

Where the plaintiff does not present direct evidence of discrimination and only presents circumstantial evidence, the claim is analyzed using the *McDonnell Douglas* burden-shifting approach. Clay v. United Parcel Serv., Inc., 501 F.3d 695, 703 (6th Cir. 2007). Under this approach, the plaintiff must first make out a *prima facie* case of discrimination. Id. at 703. To make out a *prima facie* case, the plaintiff must show that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006).

If the plaintiff establishes a *prima facie* case, a presumption that the defendant discriminated against the plaintiff arises, and the defendant then bears the burden of putting forth a "legitimate, nondiscriminatory reason" for the complained of adverse treatment. Id. at 706 (citation omitted). If the defendant satisfies this burden, the presumption of discrimination disappears, and the plaintiff must show that the defendant's proffered nondiscriminatory reason was a pretext for discrimination. Id. at 706-07. Throughout this burden-shifting framework, the plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, that she suffered illegal discrimination. Id. at 707.

In addition to prohibiting employers from discriminating solely on the basis of race, Title VII also prohibits employers from using race as a motivating factor for an

employment practice. 42 U.S.C. § 2000e-2(m). Such use of a prohibited factor is prohibited even when there are other, permissible, motivating factors present. Id. In particular, the Sixth Circuit Court of Appeals recently held that, "to survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was a motivating factor' for the defendant's adverse employment action." White v. Baxter Healthcare Corp., 533 F.3d 381, 400 (6th Cir. 2008). Because Michigan courts consider federal Title VII law to be "highly persuasive" in interpreting ELCRA, the Court will apply White to Porterfield's ELCRA claims. Meyer v. City of Center Line, 242 Mich. App. 560, 570 (2000); see Pucci v. Nineteenth Dist. Ct., 565 F.Supp.2d 792, 811 (E.D. Mich. 2008) (applying White to a mixed-motive ELCRA claim because "state law discrimination claims parallel the Sixth Circuit's Title VII jurisprudence").

      i.      Direct Evidence

Contrary to Porterfield's claim in her brief, she has not presented direct evidence of discrimination. The only evidence of sex-based discrimination she has presented is the fact that she was replaced by a male. This evidence, however, does not require the conclusion that unlawful discrimination was a motivating factor in the Porterfield's termination. Accordingly, it does not constitute direct evidence. See Wexler, 317 F.3d at 570.

Likewise, Porterfield has not presented direct evidence of racial discrimination. Porterfield's best evidence of racial discrimination is Floyd's comment to Myers, where

9

he allegedly referred to Porterfield and stated, "that nigger has to go." Although one could certainly infer discriminatory intent from such a comment, it is not direct evidence of discrimination because it does not *require* the conclusion that discriminatory intent was present. Floyd's alleged comment is racially derogatory and offensive, but he did not state that Porterfield's race was the reason that she "has to go." A jury could conclude that Floyd's use of such language to refer to Porterfield was offensive, but that he was expressing his belief that Porterfield's employment had to be terminated for some other reason apart from her race. Accordingly, Floyd's comment does not "require[] the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions," and, therefore, it does not constitute direct evidence of discrimination. See id. As such, Porterfield must establish her discrimination using circumstantial evidence.

        ii.    Circumstantial Evidence that Discrimination was Shoe Show's Sole Motive

As already discussed, it is necessary to apply the *McDonnell Douglas* burden-shifting approach when circumstantial evidence is used to make out a claim that one was discriminated against solely on account of an impermissible factor. Clay, 501 F.3d at 703. In order to make out a *prima facie* case under this approach, Porterfield must show that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class. See Wright, 455 F.3d at 706. The parties only

dispute whether Porterfield suffered an adverse action and was qualified for the store manager position.

Porterfield clearly suffered an adverse action. She was the store manager, but she was told she had to accept a keyholder position, which she testified was an assistant store manager. Not only would this be a reduction in responsibility and authority for Porterfield, but the keyholder position had a significantly lower rate of pay. Furthermore, Shoe Show's Separation Report shows that Porterfield's refusal to accept the keyholder position resulted in her involuntary termination. Regardless of whether any difference in her salary would have been covered by Porterfield's worker's compensation benefits, she suffered an adverse action.

Porterfield has not shown, however, that she was qualified for the store manager position despite the fact that she had previously held the position. In particular, the evidence shows that the store manager position required 48 hours of work each week, and Porterfield testified that, after her return to work, her body would only allow her to work about 20 hours a week. During oral argument, Porterfield's counsel contended that Porterfield wanted to work more hours, but she could not do so because Shoe Show failed to accommodate her physician-imposed restrictions. A review of the evidence in the record, however, does not reveal any support for her counsel's assertion that Porterfield could have worked more hours if she had received appropriate accommodations. Accordingly, because Porterfield could only work 20 hours a week and the store manager position required 48 hours a week of work, she was not qualified for the position. Thus, she cannot make out a *prima facie* case of discrimination. See Wright, 455 F.3d at 706.

Furthermore, even if Porterfield could make out a *prima facie* case of discrimination, her claim would fail because she has not shown that Shoe Show's articulated reason for requiring her to transition to a keyholder position—that she could not work the 48 hours per week required of a store manager—was pretext for race or sex-based discrimination. In order to establish that an employer's explanation is a pretext for illegal discrimination, the plaintiff is "required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994). The first two methods are proof are the only ones at issue because Porterfield does not contend that Shoe Show's explanation was insufficient to motivate her discharge.

In addition, Porterfield has not shown that Shoe Show's proffered reasons have no basis in fact. Porterfield testified that her body only allowed her to work for around 20 hours a week, and she does not dispute that the store manager position required 48 hours of work per week. Furthermore, as just discussed, although Porterfield's counsel asserted during oral argument that Porterfield could have worked the 48 hours per week, this assertion is not supported by the record. Therefore, Porterfield has not presented evidence showing that Shoe Show's explanation does not have any basis in fact. See id.

Likewise, Porterfield also has not shown that Shoe Show's proffered reason did not really motivate her discharge. See id. Porterfield's only evidence that Shoe Show's explanation is a pretext for sex-based discrimination is the fact that a man replaced her

as the store manager.  This, standing alone, is insufficient evidence to create a genuine issue of material fact regarding whether Shoe Show's explanation is only a pretext for sex-based discrimination.

Similarly, Floyd's comment that the "nigger has to go" is insufficient evidence to show that Shoe Show's explanation is a pretext for race-based discrimination.  Floyd's comment displayed racial animus, but he was not a decisionmaker.  Furthermore, although Floyd made the comment to Myers, who was a decisionmaker, there is no evidence showing that Myers was influenced by Floyd or this single comment by Floyd when Myers made his decisions regarding Porterfield's employment.  See Noble v. Brinker Int'l, Inc., 391 F.3d 715, 724 (6th Cir. 2004) ("Unless the statements or conduct of nondecisionmakers can be imputed to the ultimate decisionmaker, such statements or conduct can not suffice to satisfy the plaintiff's burden of demonstrating animus."). Although Porterfield stated that she felt Myers did not want to talk to her about the comment and that he "brushed her off," this alleged lack of a response does not show that Myers was influenced by the comment.  Furthermore, Floyd's comment does not indicate either that Porterfield (1) actually could work the hours required of a store manager or (2) was not terminated because of her inability to work those hours and her unwillingness to accept a part-time keyholder position.  Therefore, Porterfield has not presented evidence showing  that Shoe Show's proffered reasons did not actually motivate her discharge.  See Manzer, 29 F.3d at 1084.

Accordingly, even if Porterfield had produced sufficient evidence to make out a *prima facie* case of discrimination—which she did not—she failed to offer sufficient evidence to create a genuine issue of material fact regarding whether Shoe Show's

articulated explanation for terminating her employment was a pretext for discrimination. Thus, Porterfield has insufficient circumstantial evidence to survive summary judgment on her claim that she Shoe Show terminated her solely as a result of either sex- or race-based discrimination. See Wright, 455 F.3d at 706-07.

### iii. Mixed Motive Claim

In order to establish a mixed-motive case of discrimination under Title VII, a plaintiff must prove with either circumstantial or direct evidence that (1) the defendant took an adverse employment action against the plaintiff; and (2) "race, color, religion, sex, or national origin was a motivating factor" for the defendant's adverse employment action. White, 533 F.3d at 400.

As already discussed, Porterfield has not shown that either race or sex was a motivating factor in Shoe Show's decision to terminate her employment. As previously discussed, Porterfield has not presented evidence showing either that (1) she was qualified for the store manager position upon her return to work, or (2) Shoe Show's explanation for its adverse action—that she could not work 48 hours per week, which was required of store managers—was a pretext for discrimination. For these reasons, the Court holds that Porterfield has not presented sufficient evidence to create a genuine issue of material fact regarding whether her race or sex were motivating factors in Shoe Show's decision to terminate her employment. Therefore, she also has failed to present evidence creating a genuine issue of material fact regarding her mixed-motive claim of discrimination. See id.; Anderson, 477 U.S. at 248.

*2. Retaliation Claims*

Porterfield claims that she was illegally retaliated against for filing claims with the Michigan Department of Civil Rights ("MDCR") alleging that Shoe Show had violated ELCRA and for filing a worker's compensation claim under WDCA.

To establish retaliation under ELCRA, the plaintiff must demonstrate "(1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." Meyer v. City of Center Line, 242 Mich. App. 560, 569 (2000).

In order to establish a claim of retaliation under WDCA, the plaintiff must show that "(1) he asserted his right for worker's compensation, (2) defendant laid off or failed to recall plaintiff, (3) defendant's stated reason for its actions was a pretext, and (4) defendant's true reasons for its actions were in retaliation for plaintiff's having filed a worker's compensation claim." Chilies v. Machine Shop, Inc., 238 Mich. App. 462, 470 (1999); see M.C.L. § 418.301(11). In addition, the plaintiff must show that there was a causal connection between the filing of the worker's compensation claim and the adverse employment action. Chilies, 238 Mich. App. at 470.

Porterfield has failed to present evidence demonstrating the causal connection required for her retaliation claims under ELCRA and WDCA. Regarding Porterfield's civil rights complaints, there appears to be no evidence indicating that Shoe Show was aware of the complaints before October 26, 2006, which was three days after Porterfield's employment was terminated and she was escorted from the store by security. Therefore, she has failed to establish the necessary causal connection

15

between her discrimination complaints and her alleged termination because there is no evidence that Shoe Show knew of her discrimination charge when it allegedly terminated her employment. See Meyer, 242 Mich. App. at 569. Accordingly, this claim fails to survive summary judgment.

Porterfield also has failed to provide evidence showing the required causal connection for her claim that she was retaliated against for filing a worker's compensation complaint. She argues that the causal connection is shown by the evidence that Shoe Show terminated her employment because she would not accept an accommodation. This argument fails because that evidence only shows that her refusal to accept the accommodation led to her termination; it does not show that Shoe Show terminated her employment because she filed a worker's compensation claim months earlier. See Chilies, 238 Mich. App. at 470. Therefore, because Porterfield has presented no other evidence that her termination was caused by her filing of a worker's compensation claim, her worker's compensation retaliation claim fails to survive summary judgment. Accordingly, Porterfield has failed to create a genuine issue of material fact regarding whether her termination was in retaliation for either her civil rights complaints or her worker's compensation claim.

## V.     CONCLUSION

For the reasons discussed above, Porterfield has failed to demonstrate that there are genuine issues of material fact regarding her discrimination claim.  Likewise, she also has failed to demonstrate that there is a genuine issue of material fact regarding the causal connection requirement of her retaliation claims.  Accordingly, Shoe Show's Motion for Summary Judgment is **GRANTED.**

**IT IS SO ORDERED.**

        s/Marianne O. Battani
        MARIANNE O. BATTANI
        UNITED STATES DISTRICT JUDGE

DATED: May 22, 2009


## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and electronic filing.

        s/Bernadette M. Thebolt
        DEPUTY CLERK